Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is number 23-1712 Martono-Jokro et al. v. Merrick v. Garland At this time, would counsel for the petitioners please introduce themselves on the record? Good morning, Your Honor. May it please the Court, my name is William Hunt and I'm the petitioner to Mr. Jokro. This case, as you know, concerns a motion to reopen that was filed with the Board of Immigration Appeals. And under this Court's holding in the case of Cabas v. Barr, we had to make two showings on that motion to reopen. The first was that there had been changed country conditions in Indonesia since 2009 through the filing of the motion in 2021. And then that's the first step. Second step, we'd have to show we made a prima facie case for eligibility for asylum and to show realistic possibility of relief if there's a new hearing. So on the first step, which is to change country conditions, we contend that there was an error of law by the BIA. Under Cabas and also this Court's ruling in Sanchez-Romero v. Sessions, the BIA looks at all of the country conditions evidence from the time of the merits hearing through the filing of the motion to reopen. And in the 16 BIA decisions that we've submitted into the record from 2018 to 2023, this rule was followed. But in this case, the single BIA member wrote the large part of our submitted evidence. He called it outdated and would give it minimal probative value. And ruled there was no changed country conditions between 2009 and 2021 when the motion to reopen was filed. Let me ask you this question. Your motion to reopen focuses primarily on the Winters Affidavit, but other than that Winters Affidavit and the other BIA non-precedential cases that you cited, in your view, what are the strongest pieces of country conditions evidence in the record that show that the country conditions deteriorated for Indonesian Christians during the time period here, specifically between 2009 and 2021? Judge, I think the best way to answer your question is recently there was a panel of this court in your case number 23-1425  the BIA had denied a motion to reopen the same country saying no changed country conditions. The people came to me after that and I filed a new motion to reopen while their petition was pending in this court. And BIA just in February of this year, February 2024, issued a decision reversing itself, finding there were changed country conditions in Indonesia. I'm wondering about the direct evidence in the record in this case. Particularly focusing on the time period, let me draw you in closer to either the time period the Winters Affidavit covered or after, so close to 2021. Judge, the reason I'm going into what I just said is to answer your question. And recently a panel of this court, panel three, which included Judge Hayata, the Justice Department in their case 23-1425 Justice Department called me and said now since the second motion to reopen has been granted, will you agree to dismiss? And together we worked on a motion to dismiss, an agreed motion, and attached to that is the BIA decision from February of this year. And on more than one full page single space of that BIA decision, which is in the records of this court, there's a detailed discussion of all of the country conditions for about the last 15 years including the Winters Affidavit you're talking about. And actually it's exactly the same evidence that we filed in this motion to reopen that was just decided, reviewed and decided by the BIA in February this year. And they came to exactly the opposite conclusion. They said that those country conditions are a change in country conditions for Indonesia. So I can answer, I will answer your question, but I think if you take a look at the BIA, they've basically totally reversed themselves a couple of months ago from what they said. Counsel, we have the record before us. Your argument seems to appear to be based entirely on something that was not presented either to the BIA or to us, but you've known about it since February. Have you discussed this with the government in this case? Actually Judge, it was the Department of Justice that called me. No, no. Not in that case. Have you discussed your new argument in this case with your opposing counsel since you've known about it since February? The answer is, Judge, yes. And actually that February case is consistent with the 16 cases we've already submitted. Counsel, okay, why do you think we can consider new evidence that is not in the record and was not based on an argument made to the BIA? Well, Judge, this court can take judicial notice of its own records, and so what I'm saying is that February decision this year was consistent with the 16 decisions made from 2018 to 2023, which is in the record, so it's not new. The BIA found changed country conditions. Excuse me, is this new decision also not reported? It's a three-member panel of the BIA. It's appended to the DOJ's motion to dismiss that case, which I assented to since the motion had been granted. So you are not answering my question, are you? I apologize, Judge. I thought I was answering your question. And I did speak with fellow counsel, and I gave my opinion, and I'm very mindful about it. So, yes, I mean, it's no secret. It's no secret to the court. It's no secret to the Department of Justice. I think it's important, Judge, I think, you know, in the interest of justice, this court certainly has the... Are you asking us to withhold decisions so that you can discuss this further with your opposing counsel? Judge, I think that's absolutely fair, and I... No, I didn't. I did not ask you whether it was fair. I am asking you whether that is your position now. Judge, I think my position is that this decision is consistent with all of the others that are in the record, and certainly whatever is the court's pleasure, whatever the in any court, I say I'm fully cooperative with the judges, with fellow counsel, so certainly if fellow counsel wanted to discuss it further with me and write something into the court, obviously that's fine. Okay, counsel, what strikes me is you've known about this since February, and this has not been presented either to this court or to your opposing counsel in this case, so I take it your first position is we should address the merits of the petition before us. Yes, Judge. Okay, thank you. Your Honor, the only reason I brought it up was that I believe in that one there's a detailed discussion of what your fellow judge just asked me of the exact same country conditions that were submitted in this case before you today, and it's a detailed, extensive discussion by the BIA, by a three-member panel, which held there were changed country conditions, so I think it's very helpful. It's in the records of the court, and Your Honor, your point is well taken. I just think that it would be helpful, and in the interest of justice, I don't think it's a surprise because it is consistent with what we've already put into the record, but again, whatever is the pleasure of the court and fellow counsel is fine. Whatever I'm directed to do, I will do. Could you then return to Judge Montecalvo's question to you, which had to do with what is your best evidence putting aside the affidavit, and you replied by referring to this new decision. Do you have a different reply? Judge, I think the Professor Winter's material is in all of the 16 BIA decisions from 2018 to 2023, which I've it's in all the BIA decisions. What is in the record here? What's the evidence in the record before this court about the change in country conditions close in time to the 2021 hearing date? Closer in time to the 2021? Well, Judge, we have some news articles. There was a bombing of a Catholic church in 2021, and actually the 2023 BIA decision, which is in the record, relies on some of those same materials closer to 2021 when the motion to reopen was filed in finding changed country conditions. Mr. Hahn, could you help me? How do we deal with this issue that's underlying your presentation, which is consistency in BIA decisions? If the BIA has a case and it determines that conditions in country X have materially changed adversely for social group Y, and then it has a second case with that same country in the social group the next year or the next week, is it bound to issue the same ruling? Judge, as I said... Is there any law that says that the first BIA decision somehow is res judicata or precedent binding precedent on the next BIA panel? What I say to that, Your Honor, is there's two steps, and you have to win both. The first step, have there been changed country conditions? And we have 16, now 17, decisions over a five or six year period saying yes, they have been. So while unpublished decisions are not binding, I did cite, I did quote a Fourth Circuit case that said a single member BIA decision is entitled to modest deference, and they said one thing you look at or several factors you look at, one is consistency with prior, current, and precedent. So I'm saying that this is inconsistent with about a five year range of quite a few cases. And actually then, only then, if you find changed country conditions, then you go to the step two, which I think you're adhering to. But here, there was no going to the step two because they found there were no changed country conditions. You mentioned 16 decisions. How many of them concerned conditions in 2021? Well, the one from 2023 last year, and then there were I think, Judge, I think there were two in 2021, maybe one in 2020. So there was like 2019, 2020, 2021, and then 2023. So, and they're all consistent over those years from 2018 to 2023. Plus the one that just came before you a month or two ago, the 2024 decision. So, it just to me, it doesn't seem to make sense relying on the exact same evidence that you would arrive at the opposite conclusion. How is that fair? The Supreme Court in the cases I've cited... But that's why my question is I'm trying to get at what point do you say they're locked in? Was it one decision? Two unpublished decisions? Three? Or are you just saying whatever it is, 12 is enough? Well, Judge, I think that again, the Fourth Circuit case we cited on page 14 of our brief, it talks about the modest deference given a single member BIA decision. And it says this modest deference hinges on the thoroughness evident in the BIA's consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements, and all those factors which give it power to persuade. And I would suggest to you, Judge, there is no thoroughness in the case before you today. There is no thoroughness at all. If you look at the one I'm talking about from February this year, the BIA decision, there's much more thoroughness that goes through all of the country conditions that Your Honor was asking about throughout the entire period up through 2023, from about 2009 to about 2023. And it says there were changed country conditions. So how is that fair to these petitioners who only want to get the opportunity for a new hearing? That's all. Can I ask one more question? Just one quick question. Your clients are not associated, connected with Operation Indonesian Surrender. Is that right? No, Judge. Not these. Nor are the ones in two or three of the BIA three-member decisions, including the one February this year, and another one I've cited in my decision of people who were not involved in Operation Indonesian Surrender. So that has not been a requirement in these cases. One thing I read in your brief was, or I'm sorry, your motion to reopen was the suggestion that the risk to the Operation Indonesian Surrender participants has an effect on the conditions in the country for your clients. Did I misread that? Or am I misunderstanding your argument there? Because it would seem to me that that wouldn't have an effect on your clients since they weren't members of that operation. Judge, it has an impact because my clients have been a member of the New Hampshire Indonesian community for many, many, many years, probably a couple of decades. And many of their friends were threatened. I've submitted it to the record you're referring to. There were a large group in New Hampshire, New Hampshire Indonesians. And that evidence was excluded by the BIA in this case before you today. But in the February 2024 decision, the BIA three-member panel gave that full consideration, even though in that case that family, that Indonesian family, was not part of Operation Indonesian Surrender. So it's a fear when you see your friends being threatened with beheading or throwing in the ocean or whatever, there were many, many threats. Certainly I think that gives rise to a legitimate fear. Thank you. Any more questions? Thank you, Mr. Hahn. Appreciate it. Thank you, counsel. If counsel for the government would please introduce himself on the record to begin his response. ... ... ... ... ... May it please the Court, your Honor, it's Tim Ramitz on behalf of the United States Attorney General. In this case, the Board not adduce discretion in denying pensioners a second untimely motion to reopen claiming changed country conditions for Chinese Christians in Indonesia. We have a good starting point for this case is the Court's decision on Xiuteng, discussed by the Board, discussed by the parties. Xiuteng followed a long line of cases from 2013 and 2014 published by this Court, where four times over they rejected claims or affirmed the Board finding that there were no materially changed country conditions in Indonesia for Chinese Christians. What made Xiuteng different, the Court explained, was that the person in that case was evangelical. The central tenet of the religion was proselytizing and that's what set that person apart. According to Dr. Winters' affidavit submitted in that case as well, I know, Judge Cowdy, you were on that panel, and the Court said, this is how the government's interpreted it and how the Second Circuit has interpreted that decision, said that the difference is this person was at special risk, according to Dr. Winters. The same affidavit by Dr. Winters was considered in that case as was submitted in this case, and the Court said the main difference that set that apart was the proselytization. So what we have in this case is a petitioner who's squarely within the first four cases mentioned in Xiuteng. They've submitted evidence of ongoing negative conditions for Christians in Indonesia, but they haven't submitted evidence showing they're at special risk, like the individual in Xiuteng. And that's what the Board decided. They said that this case is different than Xiuteng. It's like the case we've considered time and time again, which has shown since 2009, the final hearing in this case, that while there's been negative conditions, there's been rising fundamentalism, rising religious intolerance in Indonesia, that persecution remains not connected to individualized risk, as what the Court has said, and just ongoing negative conditions. So just comparing the conditions. In 2009, petitioners submitted evidence showing there's been unfortunately church bombings, there's been fundamentalist closing churches, sometimes the police stand by, but overall the central government is trying to investigate and prosecute these cases. And then you also have someone being charged under an accused of blasphemy in 2009. That motion reopened in 2012, very similar events. Church closings, church bombings, blasphemy, the police sometimes stand by. You go to 2021, the most recent motion to reopen, evidence is the same. The only difference with their 2023 evidence, really, is they showed there was a blasphemy law that was expanding. And again, the expansion was for people who entice others to change their religion or proselytize. If I'm following you correctly, you're explaining why this case is different than Xiuteng. Is it different than the other 12 unpublished opinions that the petitioner has directed us towards? It is different for two reasons. First of all, we don't know exactly what evidence was submitted in those cases. Some mentioned an affidavit from Dr. Winters, others just mentioned an expert affidavit. We don't know what evidence counsel chose to present in those cases. And also, as the panel noted previously, a lot of those cases involved individuals who were part of Operation Indonesian Surrender. And they were considered to have a higher media profile because that was part of a district court litigation which presented these names to the public. And so, of those 16 decisions, I believe 11 are from 2018. So, also, to that first question, they're different for that reason. They're not even considering country conditions evidence years close to where we're at now. And secondly, we don't know the evidence that was submitted, and third, a lot of those are part of Operation Indonesian Surrender. So, it seems to be a very rational reason why the board came to different conclusions in those cases. But, to get to Judge Kayada's underlying question, and putting aside the Fourth Circuit view that you give less deference to a single judge, just put that aside. At some point, if there were a whole series of factually identical unpublished opinions which reached the opposite conclusion, would that then become arbitrary? Perhaps. What we have in this case, what we need to know, is that Fisher submitted only cases that had the outcome he desired. So, we don't know how many other cases are out there where he didn't prevail before the board. He selected cases in which he won. So, we don't have a broad survey. We would need to have some sort of broad survey to even know that. And, again, we're going back to that. We have to know what evidence was submitted. A lot of these decisions are very short. We don't know exactly what happened in those cases. And that's the problem with relying on unpublished decisions. They tend to not contain all the analysis and all the reasoning and all the data. We don't know whether it's similar to other cases. We certainly don't have that in this case here. We have no variation. We don't know, again, it's the same counsel. He presented his own cases in which he prevailed. We don't know what other cases. And we certainly do know this court and the board considers a lot of claims from Chinese Christians. If you even look at the court's own precedent, which is summarized in Ciarta, I'm mispronouncing that already, it goes over those cases from 2013 and 2014 when this court repeatedly published decisions about Chinese Christians. And not even Chinese Christians, most recently in Sutsaram, which discussed Xiutang very briefly and said Xiutang was about proselytization. Again, that was about conditions in Indonesia. So this court repeatedly sees those claims. And after all these years seeing those claims over and over again, we have 16 decisions. That's it. That can't be a sample of what the board is considering here. Let me ask you this question, focusing in on the BIA's conclusion that the Winters Affidavit evidence was outdated and therefore minimally probative. We frame this standard as requiring the petitioner to show that conditions intensified or deteriorated in some material way between the time of the merits hearing and the time of the motion to reopen. So that standard doesn't say credit the newest information more than things that came in the middle. Instead the question is whether there was a material change in the conditions during that whole time period. So I guess I'm wondering is there case law that addresses this point that supports your contentions at the BIA discretion here to sort of deem the older evidence scale? I'm not aware of a specific case law, but to me it's just a rational argument. When you get further away from a point in time, of course, evidence further away is less probative of what happened. I mean, if you look at the United States for example, if you looked at 2020 and evidence of crime during that time during the pandemic, it spikes. But as things normalized years later on, if you look at that point in time, it would not speak to what happened before. So you have to look at the most recent evidence. Recent evidence is always going to be more probative. So we get that evidence from 2017 and 2018 is actually closer in time to his motion to reopen in 2012. So I think it's just a rational argument. That evidence just simply is not going to speak to 2021 and 2023 as much as the evidence from 2021 and 2023 because as time moves forward, obviously things change. Is there a logical connection then to be drawn such that the Winter's Affidavit supports the later 2021 evidence, say the newspaper articles about the bombing of the church and of increased fundamentalism in the country? I don't believe so because the affidavit itself stops in time about 2017, 2018. So it wouldn't speak to events of 2021 and 2023. And you can look at COTANG and look at what it pulled in COTANG from Winter's Affidavit and see it's almost word for word the same affidavit as in this case. And COTANG found that it was only relevant because the person in that case was an evangelical Christian. So we have an outdated in time affidavit, one the court's already considered and said it only really should be considered if you're evangelical. And you look to his 2021 evidence and 2023 evidence in particular 2023 evidence, which the board specifically considered piece by piece in this case, which is the most recent in time, that evidence shows that the Indonesian government is working with the Indian government to promote a more moderate form of Islam. It's aware of the problem with growing fundamentalist Islam, but it has traditional pluralism. It's trying to fight that. It has a counter-terrorism task force. It considers attacks against Christians as terrorism. It has arrested people that committed acts of terrorism against Christians. It outlawed a fundamentalist group. I mean, this is the evidence of 2023 and it's showing that they are, this is not acceptable in Indonesia, but it is a growing intolerance and that's the 20, they submitted an article in the New York Times about growing youth movement of a stricter form of Islam. And the board discusses that and says this is yes, there's a growing religious intolerance, but it's not connected to persecution. So I think the board has a very good, very well-reasoned decision in this case where it's hard to say that it used its discretion or acted irrationally in this case. And the board also makes a second finding, as petitioners or counsel explain, there's two parts to these types of cases. Showing changed country conditions and showing prima facie eligibility. And so the cases mentioned in Sioteng, which rejected these claims previously, also rejected these claims for that reason. Dr. Winters was present in all of those prior cases too. And they said Dr. Winters' affidavit still might, it shows general conditions of unrest, but you still have to show an individualized risk to you. And they said despite Dr. Winters' affidavit, like Petitioner and for example Sima Marta mentioned in Sioteng, they didn't show how those connected to their own individualized risk. And that's the same here. That's what the board is saying. I know Petitioner's reply brief says, well the board didn't say enough and that's why we didn't mention it. But if they really believed the board didn't say enough, that's what they would have said in their opening brief. But they didn't make a challenge to prima facie eligibility in the opening brief. And that's why the government says this claim is waived and the because you have to, as Petitioner states, you have to establish prima facie eligibility a reasonable likelihood you're going to prevail. He didn't even challenge that finding. And that's all we need in this case. But I think we also have the other part of it too where there's not materially changed country conditions, not significantly worsened conditions, different in kind that the court has considered over and over and over again. Do you want to address the 2023 case that your opponent brought up and urged us to look at the record there? The same argument runs to that. We don't know what evidence was presented. He handed me the copy of the case he was mentioning to the panel during his argument and I briefly looked it over and it also was an Operation Indonesian Surrender case. So that seems to be a growing theme that the board will grant reopening in those cases perhaps because they have a public profile. And he admits that's not the case here. Unless the panel has any further questions. No, thank you. Thank you, counsel. That concludes argument in this case.